DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Monica G., appeals from the decision of the Lorain County Court of Common Pleas, that terminated her parental rights to her minor child, A.K., and placed the child in the permanent custody of Lorain County Children Services ("LCCS"). We affirm.
 I. {¶ 2} Monica G. ("Mother") is the mother of A.K., born March 11, 2004. Marqua K., ("Father") is the father of A.K., but is not a party to the present appeal. Mother also has a second child, born in December 2005, whose custody is not at issue in this action.
 {¶ 3} LCCS became involved with this family shortly after A.K.'s birth upon concerns of domestic violence and a risk of harm to the child. Father reportedly injured Mother's nose and threatened her with a gun. Mother responded by throwing objects at Father and made statements that appeared to threaten the safety of the child. A safety plan was implemented on April 15, 2004, and the child was placed with the paternal grandmother and paternal great-grandmother.
 {¶ 4} In May 2004, LCCS filed a complaint in juvenile court, alleging that A.K. was neglected and seeking temporary custody of the child. The agency claimed that there was a history of domestic violence between the parents, that both parents had mental health issues, and that Mother had unresolved issues stemming from physical abuse by her own mother. As a small child, Mother suffered a head injury, which led to a stroke and left her with reduced functioning on the right side of her body.
 {¶ 5} On July 26, 2004, the trial court adjudicated the child as neglected and granted an order of temporary custody. The child was placed with Christina Ruffin, a paternal cousin. By November 2004, Ruffin was no longer willing or able to provide care for the child, and A.K. was placed in a foster home.
 {¶ 6} LCCS focused its case planning efforts on the mental health of both parents, the history of domestic violence in the home, Mother's parenting ability, Mother's lack of stable housing and finances, Father's history of criminal involvement, and Father's substance abuse issues.
 {¶ 7} On August 2, 2005, LCCS moved for permanent custody of the child. Following a hearing, the trial court found that the child could not be placed with either parent within a reasonable time or should not be placed with either parent. The court also found that permanent custody was in the best interests of the child. The trial court, therefore, terminated Mother's parental rights and placed the child in the permanent custody of LCCS.
 {¶ 8} Mother timely appeals and assigns one error for review.
 II.
"THE ORDER OF THE TRIAL COURT GRANTING PERMANENT CUSTODY OF [A.K.] TO LORAIN COUNTY CHILDREN SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 9} Mother contends that the weight of the evidence fails to support an award of permanent custody to LCCS. Before a juvenile court can terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C.2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95, 97-99.
 {¶ 10} Each prong of the permanent custody test requires proof by clear and convincing evidence. See R.C. 2151.414(B)(1). Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 11} When reviewing the weight of the evidence, this Court applies the same test in civil cases as it does in criminal cases. Tewarson v. Simon (2001), 141 Ohio App.3d 103, 115. "`The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" (Alterations sic.) Id., citing State v.Thompkins, (1997), 78 Ohio St. 3d 380, 387, quoting State v.Martin (1983), 20 Ohio App. 3d 172, 175.
 {¶ 12} The trial court found that the first prong of the permanent custody test was satisfied by a finding that A.K. could not be placed with either parent within a reasonable time or should not be placed with either parent. Specifically, the trial court found that (1) the parents failed continuously and repeatedly to remedy the condition which caused the child to be placed outside the home, pursuant to R.C. 2151.414(E)(1); (2) Father suffered from chronic mental illness, pursuant to R.C.2151.414(E)(2); and (3) the parents demonstrated a lack of commitment to the child or an unwillingness to provide an adequate permanent home for the child, pursuant to R.C.2151.414(E)(4).[1] The trial court also found that permanent custody was in the best interest of A.K. Consequently, the trial court terminated parental rights and placed A.K. in the permanent custody of LCCS. Mother has asserted that LCCS did not meet its burden on either prong of the permanent custody test. We disagree.
 {¶ 13} The following evidence supported the trial court's conclusions that the parents failed to substantially remedy the conditions that caused A.K. to be placed outside the home and that the parents demonstrated a lack of commitment to the child or an unwillingness to provide an adequate, permanent home for the child. The finding regarding chronic mental illness referred only to Father. Because Father has not appealed, and because the record fully demonstrates that he failed to remedy the condition which caused A.K. to be removed from the home and failed to demonstrate a commitment to her, this additional finding need not be addressed.
 {¶ 14} In the present case, A.K. was initially removed from the home because Father had engaged in domestic violence against Mother and created a risk of harm for the child. Father was incarcerated on domestic violence and drug-related charges for much of the time this case was pending. Father completed a mental health assessment, but did not engage in any therapeutic services, nor did he participate in the permanent custody hearing. According to Katy MacKeigan, the LCCS caseworker assigned to this case, Father blamed others for provoking him into violence, and he accepted no responsibility for the problems in this family. He demonstrated little, if any, positive relationship with his child.
 {¶ 15} For her part, Mother contends that she substantially completed all aspects of her case plan objectives. Specifically, she claims she attained stable housing, was engaged in counseling, and was addressing domestic violence issues. Our review of the record indicates, however, that Mother had actually made minimal progress towards attaining her case plan objectives because she failed to implement much of what had been attempted to be taught in the classes she attended and failed to act responsibly upon the advice she had been given. She made virtually no progress for an entire year after A.K. was removed from her home, and only began making some limited progress after the motion for permanent custody was filed, some 16 months after the child was removed from her home.
 {¶ 16} As to housing, Mother had stayed in seven or eight different locations during these proceedings, and did not secure a safe place to live until November 2005. Prior to that, she lived with various friends, could not maintain one apartment, and failed to keep an appointment to obtain another. She had maintained her current apartment for only one month at the time of the permanent custody hearing.
 {¶ 17} Budgeting was also a concern. Despite receiving social security disability income, free housing, food stamps, and other assistance, Mother often could not afford bus fare to visit her child. Mother testified that she was scheduled to begin two weeks of job-training at the Bureau of Vocational Rehabilitation in the month following the hearing in this matter. Mother had made no other efforts to obtain employment during the pendency of this case.
 {¶ 18} Mother attended parenting classes and was able to recite facts about child development and childcare. Yet, Mother failed to demonstrate through her behavior and actions that she could implement many things she should have learned in those classes. Initially, Mother was preoccupied with Father and could not focus on her child or provide any nurturing interaction. She was not able to pick up on clues from the child, such as when she was tired. Mother would let her personal frustration control her demeanor and behavior, and was not able to put the needs of the child first. Significantly, she attended only half of the 48 scheduled visits. At one point, she missed six weeks in a row, seriously interrupting any effort to bond with her young child. She repeatedly failed to bring diapering supplies and snacks to visits despite frequent reminders. She arrived an hour and one-half late to the child's birthday party in March 2005. When she did arrive, she allowed her angry mood to prevent her from having any positive interaction with A.K.
 {¶ 19} It was not until after the motion for permanent custody was filed that Mother's visits began to improve somewhat. Since then, according to the caseworker, Mother was more attentive to the child, and A.K. was more comfortable and responsive to Mother's presence. There was an improvement in bonding by Mother. Mother's counselor, Jane Moore, thought Mother behaved appropriately during the two recent visits she observed. Janet Toth, the guardian ad litem, also believed that there had recently been significant progress in the interaction between Mother and A.K.
 {¶ 20} Still, the guardian ad litem, and others admitted that the child was friendly and went to anyone in the room as much as Mother. In fact, several witnesses believed the child preferred to go to others to have her needs met even at this late date. The caseworker continued to be concerned with Mother's judgment and her difficulty in prioritizing the child's needs. The caseworker also continued to observe impulsivity in Mother's behavior as well as an inability to cope with frustration and stress. She noted that Mother's visits never progressed beyond weekly monitored visits. Two-hour visits had to be reduced to one hour, and an effort to increase visits to twice weekly failed. While the case aide detected some improvement during recent visits, she also indicated that she would not presently feel comfortable leaving Mother alone with her child for more than half an hour. The aide also testified that she believed Mother would have difficulty taking care of herself and a child simultaneously.
 {¶ 21} As a result of the mental health objective in her case plan, Mother completed a neurological evaluation which confirmed that Mother's head injury did not affect her mental health. Mother also completed a psychiatric assessment, which resulted in a recommendation of counseling. She attended counseling sessions for four or five months in Lorain County, but was not engaged in the process and made little progress. In November 2004, Mother moved to Cuyahoga County. There, beginning in January 2005, she participated in weekly counseling sessions with Jane Moore of West End Ecumenical Ministry. In those sessions, she addressed impulsivity, depression, irritability and anger as regards Father. According to Moore, it took Mother a long time to develop trust and therapeutic rapport. Again, it was not until August 2005 that Mother reportedly began making some progress in dealing with her anger.
 {¶ 22} Counselor Moore explained that her agency also provided case management services for clients who have mental health diagnoses that interfere with their functioning and their ability to properly access benefits and resources. That meant that someone at the agency would make the telephone calls to LCCS to confirm Mother's visits with her child and often arrange for her transportation. Counselor Moore said she has discussed with Mother that she needs to start taking responsibility to get to visits because "I can't do that all the time." Katy MacKeigan, the LCCS caseworker, provided Mother with Greyhound bus tickets and made arrangements for Mother to have access to a program that provided door-to-door transportation for disabled persons, but agreed that Mother needed to accept more responsibility. While Moore believed Mother had made progress, the counselor said she still struggled to communicate with Mother.
 {¶ 23} LCCS's central concern was Mother's history of domestic violence and her tendency to minimize its implications on her safety as well as on the safety of her daughter. Mother participated in counseling and domestic violence classes, yet she continued to involve herself in violent and abusive relationships. Initially, she was involved in a violent relationship with Father. Mother declined her caseworker's early advice to go to a shelter. When Father was released from jail in March 2005, Mother was advised by both her caseworker and counselor to stay away from him, yet she met with him because, as she explained, they both still wanted to be a family. Unfortunately, when they met, he struck her. The next month, at the April 2005 semiannual review hearing, Mother and Father asked if they could see each other again. Mother now claims she has not seen Father since that hearing, but stated that he has left harassing and threatening messages on her telephone, and that of her boyfriend's family. There is no evidence of contact by Father since May or June 2005.
 {¶ 24} Disturbingly, Mother admitted that Michael Kelley, her new boyfriend, and the father of her second child, has also physically and verbally abused her. The caseworker testified that Mother reported at least three incidents of abuse by Kelley to her, occurring in April, August and November of 2005. Mother also told the caseworker she was afraid of Kelley.
 {¶ 25} Counselor Moore felt that Mother was "fairly safe" in her current situation. Moore admitted, however, that it was not healthy for Mother to continue her relationship with Father based on his abusive nature and acknowledged concern regarding the most recent incident with Michael Kelley. The guardian ad litem admitted that any abuse was too much, but felt that the incidents involving Kelley were "minor" as compared to those involving Father. She did not recommend immediate return of the child to Mother's care, however.
 {¶ 26} The caseworker expressed concern that Mother often displayed a rather antagonistic attitude, a dynamic that, when combined with men of violent tendencies, could endanger her safety and place A.K. at continued risk. Mother's counselor acknowledged, too, that Mother often displayed a hostile manner, which made it difficult for her to communicate with others.
 {¶ 27} In her testimony, Mother attempted to minimize the seriousness of the incidents involving Michael Kelley, but at the same time asserted that she does not permit Kelley to live with her, so that he can pose no risk of danger to A.K. Nevertheless, Mother also admitted that she continues to permit Kelley in her home and allows him to baby-sit her infant child, including during the permanent custody hearing in this case.
 {¶ 28} Mother admitted that she had been irresponsible and behaved improperly in the past, but promised that she has learned to put her children first and to focus on them and their feelings. She promised she would attend every visit if an extension were granted.
 {¶ 29} A.K. has been out of Mother's care since she was one month old. Mother has been given a great deal of time, opportunities and help in an effort to remedy the problems that created a risk to the child, and to demonstrate a commitment to provide a safe, secure home. Yet, she has failed to do so. Mother loves her child, but the mere promise of change is not enough.
 {¶ 30} There was ample evidence before the trial court from which it could conclude that the parents failed to substantially remedy the condition that caused LCCS to remove A.K. from the home and also that the parents demonstrated a lack of commitment toward the child or an unwillingness to provide an adequate, permanent home for the child. Therefore, the trial court's finding that A.K. could not be placed with either parent within a reasonable time or should not be placed with either parent satisfies the first prong of the permanent custody test.
 {¶ 31} Mother also challenges the trial court's finding that permanent custody was in the best interests of the child. When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C.2151.414(D)(1)-(4).[2]
Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith
(Jan. 2, 2002), 9th Dist. No. 20711, at *6; see, also, In rePalladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 32} The first best interest factor requires the court to consider the child's interactions and interrelationships with others. The evidence demonstrates that Mother failed to attend scheduled weekly visits with her child on a regular basis. Her visits failed to progress beyond weekly monitored visits, and the visits were even cut back from two hours to one hour. Although Mother's relationship with A.K. had improved very recently, the child still tended to seek comfort from the case aide or caseworker when they were in the same room. There is no evidence that A.K. had a continuing relationship with any other relatives.
 {¶ 33} At the same time, the child had developed a very loving relationship with the foster family with whom she had been placed for over a year. She had bonded with the mother, father, and two young, adopted children in that family. The foster parents expressed an interest in adopting A.K. if they are permitted to do so.
 {¶ 34} Because the child was less than two years old at the time of the permanent custody hearing, the guardian ad litem spoke on her behalf. The guardian ad litem did not favor termination of parental rights, but neither did she believe that the child could be placed immediately in the care of Mother. Instead, she recommended an extension of temporary custody so that Mother might have an opportunity to spend extended time with the child and might demonstrate whether she is able to provide for the child's basic needs. The guardian ad litem pointed to recent progress by Mother in her relationship with A.K. However, there was no evidence that Mother was ready for extended visits. In fact, the case aide who monitored Mother's visits stated that she did not feel comfortable leaving Mother with A.K. for longer than half an hour.
 {¶ 35} Third, the custodial history of A.K. reflects that she has spent almost her entire life outside of Mother's custody. She lived with Mother for one month, and was placed with relatives for approximately six months. She has resided with a foster family for more than a year. In her foster home, A.K. has developed a close bond with the family, and the foster mother has indicated that she and her husband wished to adopt her. The caseworker felt it was in A.K.'s best interest to maintain that bond and attachment.
 {¶ 36} Finally, the evidence indicated that A.K. was in need of a legally secure placement. Neither parent was presently able to provide a safe, secure home for the child, nor were any relatives willing and able to care for her. Consequently, the trial court reasonably concluded that a legally secure placement could only be achieved through a grant of permanent custody to LCCS.
 {¶ 37} Given the evidence before the trial court, we find that it did not lose its way in concluding that permanent custody was in the best interest of A.K. Consequently, the trial court did not err in terminating Mother's parental rights and placing A.K. in the permanent custody of LCCS. Mother's sole assignment of error is overruled.
 III. {¶ 38} Mother's assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Whitmore, P.J. Carr, J. concur.
[1] The trial court also indicated that it relied on "other factors," pursuant to R.C. 2151.414(E)(16), in support of its determination on the first prong of the permanent custody test. As those other factors are unspecified, we do not consider that finding.
[2] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.